## ESTADO LIBRE ASOCIADO DE PUERTO RICO
## TRIBUNAL DE APELACIONES
## PANEL II

| | | |
|---|---|---|
| OFICINA DE ÉTICA GUBERNAMENTAL<br><br>Recurrida<br><br>v.<br><br>ELÍ DÍAZ ATIENZA<br><br>Recurrente | KLRA202400531 | *Revisión Administrativa* procedente de la Oficina de Ética Gubernamental de Puerto Rico<br><br>Caso Núm. 21-36<br><br>Sobre: Violación al Artículo 4.2, Incisos (B), (R) y (S) de la Ley orgánica de la Oficina de Ética Gubernamental de Puerto Rico, Ley Núm. 1 de 3 de enero de 2012, según enmendada |

Panel integrado por su presidente el Juez Bermúdez Torres, la Jueza Martínez Cordero y el Juez Cruz Hiraldo

**SENTENCIA**

En San Juan, Puerto Rico, a 29 de enero de 2025.

I.

El 30 de diciembre de 2020 la Oficina de Ética Gubernamental (OEG), presentó *Querella* contra el Sr. Elí Díaz Atienza imputándole haber violado los incisos (b), (r) y (s) del Art. 4.2 de la Ley Núm. 1 de 3 de enero de 2012, según enmendada, conocida como la *Ley Orgánica de la Oficina de Ética Gubernamental* (LOOEG).[1] El 1 de febrero de 2021, el señor Díaz Atienza, mediante su contestación a

---

[1] 31 LPRA § 1857a. En primer lugar, alegan que mientras el señor Díaz Atienza era presidente ejecutivo de la Autoridad de Acueductos y Alcantarillados (AAA), autorizó al señor Yoniel Arroyo Muñiz, vicepresidente ejecutivo de la Administración de dicha entidad que entregara su vehículo oficial asignado en las instalaciones de Operaciones de Aguadilla de la AAA, en lugar de la sede en San Juan. La parte querellante, alegó que de ese modo el señor Díaz Atienza permitió al señor Arroyo Muñiz utilizar un vehículo oficial para su transporte oficial entre el área oeste de la isla, cerca de su residencia en Moca, y su lugar de trabajo en San Juan.

En segundo lugar, plantearon que dicho permiso a utilizar el vehículo oficial para el transporte hacia su lugar de trabajo ocasionó la pérdida de fondos públicos por concepto de gastos de peaje, gasolina y mantenimiento que desembolsó la AAA.

la *Querella,* aceptó algunas alegaciones, negó otras y presentó defensas especiales y afirmativas. El 31 de agosto de 2021, tras haber culminado el descubrimiento de prueba, las partes presentaron el *Informe sobre conferencia con antelación a la audiencia.* El 24 de septiembre de 2021 se celebró la Conferencia con antelación a la vista. El 27 de septiembre de 2021, la OEG presentó *Querella* enmendada y el 19 de octubre de 2021, el señor Díaz Atienza su contestación a esta.

Así las cosas, el 10 de marzo de 2022, la OEG presentó una *Solicitud de sentencia sumaria.* Alegó que no existía controversia de hechos esenciales y materiales que impidieren la expedición de una resolución sumaria. Arguyó que, solo restaba que el foro administrativo aplicara el derecho y dispusiera del caso sin necesidad de celebrar una vista evidenciaría.

El 18 de abril de 2022, el señor Díaz Atienza se opuso a la solicitud de resolución sumaria de la OEG y solicitó se resolviera la controversia sumariamente, pero a su favor. A su vez, impugnó la insuficiencia de prueba presentada por la OEG para establecer el uso ilegítimo del vehículo oficial. Sostuvo que, de existir prueba sobre algún uso ilegal, el mismo no fue autorizado. Añadió que, la OEG interpretó errónea y abarcadoramente la Ley Núm. 1-2012 para imponerle una responsabilidad vicaria que no provee la *Ley Uniforme de Vehículos Oficiales del Estado Libre Asociado de Puerto Rico,* Ley Núm. 60 de 30 de mayo de 2014, según enmendada. Asimismo, alegó que, la referida Ley adolece de vaguedad y no delega en el presidente ejecutivo de la AAA el deber preciso de fiscalizar el uso y mantenimiento de la flota de vehículos. En la alternativa, solicitó la desestimación de la *Querella* en su contra o, que se celebrara la vista en sus méritos.

El 25 de mayo de 2022, la OEG presentó su *Oposición a la solicitud de resolución sumaria* incoada por el señor Díaz Atienza y

reiteró la solicitud de sentencia sumaria a su favor.[2] Argumentó que, contaban con evidencia que sustenta todos los elementos de las conductas imputadas y que las razones expuestas por el señor Díaz Atienza para haber viabilizado el uso ilegal de un vehículo oficial no eran válidas ni suficientes para eximirle de responsabilidad.

Por otra parte, el 31 de mayo de 2022, el señor Díaz Atienza presentó su réplica a la oposición a solicitud de sentencia sumaria a favor de este y solicitud de resolución sumaria a favor de la OEG.[3] Sostuvo que no autorizó el uso personal del vehículo oficial y que tampoco adelantó un beneficio a un tercero que fuera persona privada. Alegó que, su autorización fue dirigida a adelantar un fin público, amén de que, el Reglamento Núm. 9177 de la Administración de Servicios Generales de Puerto Rico, delega responsabilidades de velar por el uso de la flota de vehículos de titularidad del Estado o sus agencias o corporaciones públicas en personas que ostentan cargos a esos efectos y no al jefe de agencia.[4]

Posteriormente, el 25 de enero de 2023, la Oficial Examinadora emitió *Orden* en la cual estableció varias determinaciones de hechos sobre las que consideró que no existía controversia alguna.[5] Sin embargo, determinó que la existencia de controversias de hechos esenciales le impedía disponer sumariamente del caso. Según su criterio, existía controversia de hechos en cuanto a la jornada laboral del señor Arroyo Muñiz y ciertos aspectos relacionados al puesto de confianza del vicepresidente ejecutivo de la Administración de la AAA. También,

---

[2] Apéndice 10 del *Recurso de Revisión Judicial* del Recurrente, págs. 354-373.

[3] Apéndice 11 del *Recurso de Revisión Judicial* del Recurrente, págs. 374-388.

[4] El 8 de diciembre de 2022, el señor Díaz Atienza, presentó una moción para que se tome conocimiento oficial de la *Resolución* emitida en el caso núm. NA-FEI-2022-0040 del 22 de noviembre de 2022 ante el Panel sobre el Fiscal Independiente de Puerto Rico (PFEI). En el referido caso, los miembros de PFEI ordenaron el archivo del caso luego de considerar que no existía causa para creer que el presidente ejecutivo de la AAA incurrió en conducta violatoria del Código Penal u otras disposiciones de la Ley 1-2012, bajo el quantum de prueba de más allá de duda razonable.

[5] Apéndice 13 del *Recurso de Revisión Judicial* del Recurrente, págs. 406-410.

sobre cómo las actuaciones del querellado Díaz Atienza menoscabaron la confianza del público en sus instituciones gubernamentales.

Inconforme, el 30 de enero de 2023, el señor Díaz Atienza presentó sin éxito, *Moción de Reconsideración.* El 8 de junio, 13 y 14 de julio de 2023, se celebró la vista en su fondo. El 8 de septiembre de 2023, las partes presentaron sus argumentaciones finales mediante *Memorando de la parte querellada* y *Moción en cumplimiento de orden y argumentación final de la OEG.*[6] Seguido, el 18 de septiembre de 2023, el señor Díaz Atienza presentó una réplica a la argumentación final de la OEG.[7]

El 24 de julio de 2024, notificado el 29, la OEG acogió las recomendaciones del *Informe del Oficial Examinador* Oficial y emitió *Resolución* de conformidad.[8] De esa forma, desestimó y archivó las imputaciones por violación a los incisos (r) y (s) del Art. 4.2 de la LOOEG, sin embargo, impuso multa de $2,000.00 por la trasgresión al inciso (b) del Art. 4.2 de la LOOEG. En desacuerdo, el señor Díaz Atienza presentó una *Moción de Reconsideración* ante la OEG.[9] Denegada su reconsideración el 29 de agosto de 2024, el 27 de septiembre de 2024 el señor Díaz Atienza recurrió ante nos *Recurso de Revisión Judicial.* Plantea:

> **PRIMER ERROR:**
> ERRÓ LA OEG AL APLICAR LA LEY NÚM. 60-2014 DE MANERA VAGA E IMPRECISA, SIN DEFINIR CLARAMENTE EL TÉRMINO "JORNADA LABORAL" NI EL LUGAR D[Ó]NDE DEBÍA ENTREGARSE EL VEHÍCULO OFICIAL, LO QUE LLEVÓ A UNA INTERPRETACIÓN ARBITRARIA Y CONTRARIA AL TEXTO E INTENCIÓN DE LA LEY. ADEMÁS, LA OEG ASUMIÓ COMPETENCIA SOBRE LA INTERPRETACIÓN Y APLICACIÓN DE UNA LEY QUE ES ADMINISTRADA POR LA ADMINISTRACIÓN DE SERVICIOS GENERALES RESULTANDO EN UNA USURPACIÓN DE FUNCIONES QUE NO LE CORRESPONDEN.

---

[6] Apéndice 14 del *Recurso de Revisión Judicial* del Recurrente, págs. 411-440.
[7] Apéndice 16 del *Recurso de Revisión Judicial* del Recurrente, págs. 461-482.
[8] Apéndice 1 del *Recurso de Revisión Judicial* del Recurrente, págs. 1-34.
[9] Apéndice 2 del *Recurso de Revisión Judicial* del Recurrente, págs. 35-59.

**SEGUNDO ERROR:**
ERRÓ LA OEG EN IGNORAR LA EXISTENCIA Y APLICABILIDAD DE LA ORDEN ADMINISTRATIVA OA-2015-03 DE LA AAA, QUE PERMITE AL PRESIDENTE EJECUTIVO DE LA AAA DECIDIR QUE ALGUNOS FUNCIONARIOS ENTREGUEN LOS VEHÍCULOS OFICIALES EN INSTALACIONES DESIGNADAS POR LA AGENCIA, ESTO ESPECIALMENTE APLICABLE AL PRINCIPAL FUNCIONARIO EJECUTIVO ENCARGADO DE EMERGENCIAS.

**TERCER ERROR:**
ERRÓ LA OEG EN INTERPRETAR INCORRECTAMENTE EL ARTÍCULO 4.2 (B) DE LA LEY DE ÉTICA GUBERNAMENTAL Y EL CONCEPTO DE "PERSONA PRIVADA", AL CONCLUIR QUE EL USO DEL VEHÍCULO OFICIAL CONSTITUÍA UN BENEFICIO PROH[Í]BIDO POR LA LEY DADO QUE, EN REALIDAD NO SE CONFIGURÓ UN BENEFICIO A FAVOR DE UNA PERSONA PRIVADA O NEGOCIO, YA QUE EL VEHÍCULO FUE UTILIZADO POR UN FUNCIONARIO PÚBLICO EN EL EJERCICIO DE SUS DEBERES, SIENDO ESTO UNA USURPACIÓN DE LOS DEBERES DELEGADOS A LA ASG.

**CUARTO ERROR:**
ERRÓ LA OEG AL CONCLUIR QUE LA ENTREGA DEL VEHÍCULO OFICIAL POR PARTE DEL DR. ARROYO EN LAS INSTALACIONES DE LA AAA EN AGUADILLA NO CUALIFICABA BAJO LA EXCEPCIÓN DE LA ORDEN ADMINISTRATIVA OA-2015-03 Y AL NO RECONOCER QUE, COMO VICEPRESIDENTE EJECUTIVO, PODÍA LEGÍTIMAMENTE ENTREGAR EL VEHÍCULO EN UNA OFICINA DISTINTA A SU OFICINA REGULAR. ADEMÁS, LA OEG NO VALORÓ CORRECTAMENTE LA PRUEBA PERICIAL NI LA PRUEBA TESTIFICAL CONTENIDA EN EL EXPEDIENTE ADMINISTRATIVO, QUE DEMOSTRABAN QUE NO HUBO NINGÚN BENEFICIO PERSONAL INDEBIDO PARA EL DR. YONIEL ARROYO. AL ACTUAR DE ESTA FORMA, LA OEG SE APARTÓ DEL ESTÁNDAR DE EVIDENCIA CLARA, ROBUSTA Y CONVINCENTE, COMPROMETIENDO LA INTEGRIDAD DE SUS CONCLUSIONES Y LLEGANDO A LA DETERMINACIÓN DE HECHOS QUE NO CUMPLIERON CON EL ESTÁNDAR DE PRUEBA CLARA, ROBUSTA Y CONVINCENTE.

**QUINTO ERROR:**
ERRÓ LA OEG AL IMPONER UNA MULTA DE $2,000.00 SIN APLICAR EL PRINCIPIO DE RAZONABILIDAD Y PROPORCIONALIDAD, CONSIDERANDO QUE LAS CIRCUNSTANCIAS DEL CASO Y NATURALEZA DEL USO DEL VEHÍCULO OFICIAL NO JUSTIFICAN UNA SANCIÓN DE TAL MAGNITUD, ESPECIALMENTE DADO EL CONTEXTO DE EMERGENCIA EN EL QUE ACTUABA EL FUNCIONARIO.

El 8 de octubre de 2024, concedimos a las partes hasta el 1 de noviembre de 2024 para presentar la estipulación de la prueba

oral, y a partir de esa fecha, un término de treinta (30) días a la OEG para presentar su *Alegato en Oposición*. El 22 de noviembre de 2024, la OEG presentó su *Alegato en Oposición*. Con el beneficio de la comparecencia de las partes, la reproducción de la prueba oral, el Derecho y jurisprudencia aplicable, estamos en posición de resolver.

II.

Discutiremos conjuntamente el primer y segundo error por estar estrictamente relacionados. En el primero, el señor Díaz Atienza aduce que erró la OEG al aplicar la Ley Núm. 60-2014 de manera vaga e imprecisa, sin definir claramente el término de jornada laboral ni el lugar de donde se debía entregar el vehículo oficial y que, por tanto, se llegó a una interpretación arbitraria y contraria al texto e intención de la Ley. En el referido error alega que, la OEG no podía asumir competencia sobre la interpretación y aplicación de una Ley que es administrada por la Administración de Servicios Generales resultando en una usurpación de funciones que no le corresponden.

En su segundo señalamiento el señor Díaz Atienza imputa error a la OEG por ignorar la existencia de la Orden Administrativa OA-2015-03, que permite al presidente ejecutivo de la AAA decidir que algunos funcionarios entreguen los vehículos oficiales en instalaciones designadas por la Agencia. En contraste, la OEG alega que el señor Díaz Atienza tenía un horario establecido de 7:30am-4:00pm en la Oficina del Presidente Ejecutivo en la sede de San Juan, y que, por tanto, la interpretación referente a la aplicación de la Orden Administrativa que hace el recurrente es *ultra vires*. Veamos.

A.

La Ley Núm. 60-2014 tiene como propósito limitar "el uso del vehículo oficial del jefe de agencia o funcionario público, únicamente a la gestión laboral, y para el ejercicio exclusivo de la función

pública".[10] Según el estatuto, jornada laboral "[s]ignifica el periodo destinado a rendir labores en una agencia, que puede extenderse a más de ocho (8) horas diarias, incluyendo los fines de semana".[11] En cuanto a la disposición del vehículo, el Art. 4 de referida Ley establece que:

> Luego de concluida la jornada laboral el Jefe de Agencia, Funcionario Público o la persona encargada, entregará el vehículo oficial a la agencia. El Jefe de Agencia, Funcionario Público o la persona encargada del vehículo anotará en una bitácora, la hora de salida y llegada, el millaje del vehículo oficial al momento de la salida y al momento de su llegada, así como un resumen del historial de los viajes realizados en el día.[12]

El Art. 3 de referida Ley dispone que:

> Ningún Jefe de Agencia o Funcionario Público está autorizado a utilizar cualquier vehículo oficial una vez concluida la jornada laboral, independientemente el vehículo se haya adquirido mediante compraventa o arrendamiento por cualquier otro departamento, dependencia, instrumentalidad, o corporación pública, de la Rama Ejecutiva del Estado Libre Asociado de Puerto Rico, incluyendo aquellas que se encuentran en Estados Unidos. Esta prohibición también incluye cualquier vehículo oficial sufragado con fondos del Estado Libre Asociado de Puerto Rico, al amparo del Artículo 8 de la Ley Núm. 77 de 19 de junio de 1979, según enmendada.[13]

Además, la Ley Núm. 60-2014 excluye de la aplicación de la precitada norma, a los siguientes funcionarios:

> a. Gobernador de Puerto Rico b. Secretario de Estado c. Secretario de Justicia d. Secretario del Departamento de Corrección y Rehabilitación e. Secretario del Departamento de Seguridad Pública f. Comisionado del Negociado de la Policía de Puerto Rico g. Comisionado del Negociado de Bomberos de Puerto Rico h. Comisionado del Negociado de Manejo de Emergencias y Administración de Desastres i. Comisionado del Negociado del Sistema de Emergencia 9-1-1 j. Comisionado del Cuerpo de Vigilantes del Departamento de Recursos Naturales y Ambientales k. Comisionado del Negociado de Investigaciones Especiales l. Fiscal General de Puerto Rico m. Agentes encubiertos del Negociado de Investigaciones Especiales n. Agentes encubiertos, comandantes de zona, de área y comandantes auxiliares, directores de las divisiones de homicidios, inteligencia criminal y de drogas,

---

[10] Exposición de Motivos de la Ley Uniforme de Vehículos Oficiales del Estado Libre Asociado de Puerto Rico, Ley Núm. 60-2014, (2014 [Parte 1] LPR 465).
[11] 3 LPRA § 9091.
[12] *Id.* § 9093.
[13] *Id.* § 9092.

8

directores de los cuerpos de investigaciones criminales, comandantes de distrito, comisionado auxiliar de operaciones de campo y su auxiliar y los directores de las divisiones de violencia doméstica del Negociado de la Policía de Puerto Rico. o. Comisionado del Negociado del Cuerpo de Emergencias Médicas.[14]

El Tribunal Supremo ha establecido que "una ley es inconstitucional por razón de vaguedad si: (1) una persona de inteligencia promedio no queda debidamente advertida del acto u omisión que el estatuto pretende prohibir y penalizar; (2) se presta a la aplicación arbitraria y discriminatoria, y (3) interfiere con el ejercicio de derechos fundamentales garantizados por la Constitución".[15]

Respecto a la aplicación de la doctrina de vaguedad a procedimientos administrativos, el Tribunal Supremo ha planteado que, "[e]n los procedimientos administrativos no aplican, en términos absolutos, las garantías del debido proceso de ley procesal elaboradas para los estatutos penales".[16] "[U]na ley es nula por vaguedad si sus prohibiciones no están claramente definidas. La doctrina de vaguedad se ha utilizado tradicionalmente para evaluar estatutos de índole penal".[17]

B.

La Orden Administrativa OA-2015-03 de la Autoridad de Acueductos y Alcantarillados dispone, como parte de las medidas reguladoras, que **"los vehículos oficiales no podrán ser utilizados para asuntos personales ya sea durante la jornada regular de trabajo o fuera de ella"**.[18] Además, establece que "los funcionarios y empleados de la Autoridad, una vez concluida su jornada laboral, **entregarán el vehículo oficial que utilicen para realizar sus**

---

[14] *Id.* § 9094.
[15] *Id.* en la pág. 878.
[16] *Id.* en la pág. 844.
[17] *Oficina de Ética Gubernamental* v. *Cordero Santiago*, 154 DPR 857, 877 (2021).
[18] Orden Administrativa, OA-2015-03, Para regular el uso de vehículos oficiales de la Autoridad, el 25 de julio de 2015, en la pág. 3 (énfasis nuestro).

**funciones en el lugar regular de trabajo**".[19] Sin embargo, a modo de excepción, expone que:

> [A]quellos funcionarios y empleados de la Autoridad que tienen la obligación de atender de forma directa y personal cualquier emergencia o situación que requiera atención inmediata relacionada con la operación y mantenimiento de los sistemas e instalaciones de agua y alcantarillados de la Autoridad, una vez concluida su jornada laboral entregaran el vehículo oficial en las instalaciones designadas por el Presidente Ejecutivo o su representante autorizado.[20]

Conforme establece la referida *Orden*, para determinar en dónde se entregará el vehículo, "se tomará en consideración la naturaleza de las funciones que realiza el funcionario y/o empleado, **la costo eficiencia que representa para la Autoridad y para los servicios que presta la ciudadanía**; y el espacio y seguridad con que cuenta la instalación".[21]

## III.

Ciertamente, dicha Ley Núm. 60-2014 establece claramente que jornada laboral es "el periodo destinado a rendir labores en una agencia, que puede extenderse a más de ocho (8) horas diarias, incluyendo los fines de semana".[22] La descripción clara y precisa de dicho concepto, permite a una persona de inteligencia promedio advertir cuál es el periodo de jornada laboral que se le asigna en su empleo. En este caso, según las determinaciones de hechos a las que llegó el juzgador, el señor Arroyo Muñiz tenía asignado un horario de empleo establecido de 7:30am-4:00pm en la sede de San Juan. Por tal razón, ese era el periodo establecido para el señor Muñiz Arroyo para el uso del vehículo oficial conforme a la Ley Núm. 60-2014.

En cuanto al lugar de entrega, la Ley dispone que, "luego de concluida la jornada laboral el Jefe de Agencia, Funcionario Público

---

[19] *Id.* (énfasis nuestro).
[20] *Id.*
[21] *Id.* (énfasis nuestro).
[22] 3 LPRA § 9091.

o la persona encargada, entregará el vehículo oficial a la agencia".[23] Es decir, que luego de completar su jornada laboral, el vehículo asignado tiene que entregarse en su lugar de trabajo, la sede de San Juan de la AAA. No vemos atisbo de arbitrariedad ni error en la interpretación que hiciera la OEG de ambas disposiciones. El primer error no se cometió.

En el segundo señalamiento de error el señor Díaz Atienza aduce que la OEG ignoró la existencia de la Orden Administrativa OA-2015-03. En lo pertinente, dicha *Orden* expone, a modo de excepción, que el presidente podrá asignar un lugar alterno de entrega del vehículo oficial a aquellos funcionarios que atiendan emergencias directamente. No obstante, en la medida en que las funciones del vicepresidente, el señor Muñiz Arroyo, no estaban ligadas a atender emergencias relacionadas con la operación y mantenimiento de los sistemas de la AAA, el señor Díaz Atienza no tenía facultad de asignarle un lugar de entrega alterno a la sede de la AAA en San Juan.

Aun cuando dicha *Orden Administrativa* facultara al señor Diaz Atienza a proveerle un lugar de entrega de vehículo alterno al señor Muñiz Arroyo, debían tomarse en consideración, entre otros factores, "**la costo eficiencia que representa para la Autoridad y para los servicios que presta la ciudadanía**".[24] El emitir un permiso para que el señor Muñiz Arroyo entregara el vehículo en la sede de Aguadilla de la AAA, claramente, no salvaguardó la costo eficiencia para la Agencia. El segundo error tampoco se cometió.

IV.

En su tercer señalamiento el señor Díaz Atienza aduce que, erró la OEG en interpretar incorrectamente el artículo 4.2 (b) de la

---

[23] *Id.* § 9093.
[24] Orden Administrativa, OA-2015-03, *Para regular el uso de vehículos oficiales de la Autoridad,* el 25 de julio de 2015, en la pág. 3.

Ley de Ética Gubernamental y el concepto de persona privada, al concluir que el uso del vehículo oficial constituía un beneficio prohibido por Ley. Alega que no se configuró un beneficio a favor de una persona privada, debido a que el vehículo fue utilizado por un funcionario público en el ejercicio de sus deberes.

A.

El Art. 4.2 de la LOOEG establece las prohibiciones éticas de carácter general que rigen la conducta de los servidores públicos. El inciso (b) del mencionado artículo prohíbe a los servidores públicos, "utilizar los deberes y las facultades de su cargo ni la propiedad o los fondos públicos para obtener, directa o indirectamente, para él o **para una persona privada** o negocio, **cualquier beneficio que no esté permitido por ley**".[25]

Para que se configure una infracción a este Art. 4.2 (b) de la LOOEG, deben coincidir los siguientes elementos: (1) que se trate de un **servidor público**; (2) que haya utilizado los deberes y facultades de su cargo, propiedad o fondos públicos; (3) con el fin de proporcionarse **para sí mismo**, **a una persona privada** o negocio; (4) **cualquier beneficio** que no esté permitido por ley.[26]

Según el Art. 1.2 (i) de la LOOEG constituye "beneficio": "cualquier provecho, utilidad, lucro o ganancia, sin limitar el término a una ganancia pecuniaria o material, sino que denota cualquier forma de ventaja".[27] Para procesar a un servidor público por concederle a un tercero un beneficio no permitido por ley, solo basta que no exista ley que permita el beneficio de que se trate. Además, no es necesario que el funcionario logre el beneficio económico. Basta con que haya "la intención de obtener estos beneficios, aunque sus planes se vieron frustrados".[28]

---

[25] 3 LPRA § 1857a(b) (énfasis nuestro).
[26] *OEG* v. *Rodríguez,* 159 DPR 98 (2003) (énfasis nuestro).
[27] 3 LPRA § 1854.
[28] *O.E.G.* v. *Román,* 159 DPR 401, 413 (2003).

Por otro lado, según el Art. 1.2 (i), es un servidor público aquella persona en el Gobierno que:

[I]nterviene en la formulación e implantación de la política pública o no, aunque desempeñe su encomienda permanente o temporalmente, con o sin remuneración. También, incluye al contratista independiente cuyo contrato equivale a un puesto o cargo, o que entre sus responsabilidades está la de intervenir directamente en la formulación e implantación de la política pública.[29]

El referido artículo define persona privada como "persona natural o jurídica, sin incluir las entidades públicas".[30] De estas disposiciones podemos interpretar, que si bien una persona puede calificase como servidor o funcionario público, ello no le elimina de ser una figura privada cuando no esté ejerciendo las funciones de su empleo. Es decir, un empleado o funcionario público no deja ser persona privada cuando termina su horario laboral como servidor público.

### B.

Como veremos más adelante, según la evidencia que consta en el expediente, por la naturaleza de su cargo, el señor Díaz Atienza era un funcionario público. Como tal, utilizó los deberes y facultades de su cargo, propiedad o fondos públicos para propiciar al señor Muñiz Arroyo, en su carácter de persona privada, un beneficio no permitido por Ley. Le permitió utilizar el vehículo asignado para transportarse desde un área limítrofe a su hogar hasta su empleo durante ciento veintiséis (126) días. Ello constituyó un beneficio en violación al Art. 4.02 (b). La interpretación de la OEG referente al Art. 4.02(b) fue la correcta. El tercer error señalado no se cometió.

### V.

En su cuarto señalamiento de error el señor Díaz Atienza aduce que, erró la OEG al concluir que la entrega del vehículo oficial

---

[29] 3 LPRA § 1854.
[30] *Id.*

en las instalaciones de Aguadilla no cualificaba bajo la excepción de la Orden Administrativa OA-2015-03. Además, señala que la OEG no valoró correctamente la prueba pericial ni la prueba testifical contenida en el expediente administrativo, y que, por tanto, la OEG se apartó del estándar de evidencia clara, robusta y convincente. Evaluemos la validez de su argumento.

A.

Precisa en este punto repasar el estándar probatorio con el que tiene que cumplirse para probar una violación al LOOEG. Según el Tribunal Supremo en *OEG* v. *Martínez Giraud*, 210 DPR 79 (2022), "se requiere satisfacer un estándar probatorio claro, robusto y convincente, de manera tal, que produzca en el juzgador una convicción permanente de que los asuntos fácticos son altamente probables".[31] De este modo, el cargo ético debe quedar establecido por prueba clara, robusta y convincente no afectada por reglas de exclusión, y ni a base de conjeturas.[32] Definió prueba clara, robusta y convincente como "aquella evidencia que produce en un juzgador de hechos una convicción duradera de que las contenciones fácticas son altamente probables".[33]

En cuanto al alcance o las limitaciones de nuestra facultad de revisar las determinaciones de las agencias, la *Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico* (LPAU), Núm. 38-2017, según enmendada,[34] dispone que consiste, esencialmente, en determinar si la actuación de la agencia fue dictada dentro de las facultades que le fueron conferidas por ley y si la misma es legal y razonable.[35] Al respecto, es norma de derecho claramente establecida que los tribunales apelativos han de conceder gran

---

[31] *In re Vissepó Vázquez*, 196 DPR 560 (2016); *In re Martínez Almodóvar*, 180 DPR 805, 820 (2011).
[32] *OEG* v. *Martínez Giraud*, 210 DPR 79, 93-94 (2022).
[33] *In re Ramos Mercado*, 165 DPR 630 (2005); *In re Soto Charraire*, 186 DPR 1019, 1028 (2012).
[34] 3 LPRA § 9601 *et seq.*
[35] *T-JAC* v. *Caguas Centrum*, 148 DPR 70 (1999).

deferencia y consideraciones a las decisiones de los organismos administrativos en vista de la vasta experiencia y conocimiento especializado.[36] Por lo tanto, los tribunales deben ser cautelosos al intervenir con las decisiones administrativas.[37]

Es por estas razones que, como principio axiomático, las decisiones de los foros administrativos están investidos de una presunción de regularidad y corrección.[38] La presunción de corrección que acarrea una decisión administrativa, deberá sostenerse por los tribunales a menos que la misma logre ser derrotada mediante la identificación de evidencia en contrario que obre en el expediente administrativo.[39] Ello, debido a que los tribunales deben dar deferencia a las determinaciones de las agencias sobre asuntos que se encuentren dentro del área de especialidad de éstas.[40]

Asimismo, al momento de revisar una decisión administrativa el criterio rector para los tribunales será la razonabilidad en la actuación de la agencia.[41] Hay que determinar si la agencia actuó arbitrariamente o ilegalmente, o de manera tan irrazonable que su actuación constituyó un abuso de discreción.[42] Utilizando un criterio de razonabilidad y deferencia, los tribunales no deben intervenir o alterar las determinaciones de hechos de un organismo administrativo "si las mismas están sostenidas por evidencia

---

[36] *Mun. de San Juan* v. *Plaza Las Américas*, 169 DPR 310, 323 (2006); *Hernández Álvarez* v. *Centro Unido*, 168 DPR 592, 615–616 (2006).

[37] *Metropolitana, SE* v. *ARPE*, 138 DPR 200, 213 (1995); *Viajes Gallardo* v. *Clavell*, 131 DPR 275, 289–290 (1992).

[38] *García* v. *Cruz Auto Corp.*, 173 DPR 870 (2008); *Vélez* v. *ARPE*, 167 DPR 684 (2006); *Rivera Concepción* v. *ARPE*, 152 DPR 116, 123 (2000).

[39] *ELA* v. *PMC*, 163 DPR 478 (2004); *Misión Ind. P.R.* v. *Junta de Planificación*, 146 DPR 64, 130 (1998); *ARPE* v. *Junta de Apelaciones Sobre Construcciones y Lotificaciones*, 124 DPR 858 (1989).

[40] *Rivera Concepción* v. 152 DPR, pág. 123; *Fac. C. Soc. Aplicadas, Inc.* v. *CES*, 133 DPR 521 (1993).

[41] *Rebollo Vda. de Liceaga* v. *Yiyi Motors, Motor Ambar, Inc.*, 161 DPR 69 (2004).

[42] *Asociación de Vecinos Tulip/Monteverde, Inc.* v. *Junta de Planificación*, 171 DPR 863 (2007); *Marina Costa Azul* v. *Comisión*, 170 DPR 847 (2007).

sustancial que surja del expediente administrativo considerado en su totalidad".[43]

A estos fines, se ha definido evidencia sustancial como "aquella [evidencia] pertinente que una mente razonable pueda aceptar como adecuada para sostener una conclusión".[44] Para establecer la alegación de ausencia de tal evidencia sustancial, la parte afectada debe demostrar que existe "otra prueba en el récord que razonablemente reduzca o menoscabe el peso de tal evidencia hasta el punto de que un tribunal no pueda concienzudamente concluir que la evidencia sea sustancial hasta el punto que se demuestre claramente que la decisión [de la agencia] no está justificada por una evaluación justa del peso de la prueba".[45]

En otras palabras, la parte recurrente viene obligada a derrotar la presunción de corrección de los procesos y de las decisiones administrativas.[46] Para lograr ese objetivo, tiene que demostrar que existe otra prueba en el récord que menoscabe el valor probatorio de la evidencia impugnada. Si la parte afectada no demuestra la existencia de esa otra prueba, las determinaciones de hechos de una agencia deben ser sostenidas por el tribunal revisor.[47]

Ahora bien, cuando se trate de conclusiones de derecho que no involucren interpretaciones efectuadas dentro del ámbito de especialización de la agencia, éstas serán revisables por los tribunales sin circunscribirse al razonamiento que haya hecho la agencia.[48] Cuando se trate de la revisión de determinaciones que estén entremezcladas con conclusiones de derecho, el foro judicial

---

[43] *Otero Mercado* v. *Toyota de PR Corp.*, 163 DPR 716 (2005); *Domingo Talavera* v. *Caguas Expressway Motors, Inc.*, 148 DPR 387 (1999).
[44] *Ramírez* v. *Depto. de Salud*, 147 DPR 901, 905 (1999).
[45] *Metropolitana SE* v. *ARPE*, 138 DPR 200, 213 (1995).
[46] *Fac. C. Soc. Aplicadas, Inc.* v. *CES*, 133 DPR, pág. 532.
[47] *Ramírez* v. 147 DPR, pág. 905.
[48] *Rivera* v. *A & C Development Corp.*, 144 DPR 450 (1997).

tendrá amplia facultad de revisión, como si se tratara de una cuestión de derecho propiamente.[49]

B.

En atención al planeamiento sobre la suficiencia de la prueba, exponemos las determinaciones de hechos que consignó el Oficial Examinador de la Agencia en su *Informe,* según acogidas por la OEG en su *Resolución*:[50]

1. El señor Díaz Atienza ocupó el puesto de presidente ejecutivo de la AAA desde el 4 de febrero de 2017 hasta el 27 de febrero de 2020, por lo que fue un servidor público durante dicho periodo.

2. Como presidente ejecutivo de la AAA, el querellado tuvo, entre otras, las siguientes funciones:

a. Responsabilidad primaria en la planificación, coordinación y ejecución de la implantación efectiva de planes estratégicos y de asegurar que las acciones, decisiones y operaciones de los directorados en la Oficina Central y en las regiones se condujeran de conformidad con las leyes, políticas, reglas, normas y procedimientos, estándares y acuerdos establecidos y disposiciones de la Ley Orgánica de la AAA.

b. Planifica, dirige, coordina, supervisa y evalúa el funcionamiento y todas las actividades que se desarrollaban en la AAA.

c. Participa, activamente, con el Gobernador de Puerto Rico y el presidente de la Junta de Directores de la AAA, en la formulación e implantación de la política pública de la AAA.

d. Establece una comunicación directa con los vicepresidentes ejecutivos, directores de directorados, ayudantes especiales, asesores legales, agencias reguladoras y con recursos externos para alinear las estrategias y planes de trabajo, nuevas iniciativas de servicios y desarrollo de proyectos de infraestructura y de administración, con las expectativas, resultados esperados y el cumplimiento de objetivos y misión de la AAA.

Las funciones del puesto le requerían al señor Díez Atienza competencia en leyes, reglamentos, normas y procedimientos de la AAA.

*3.* El Sr. Yoniel Arroyo Muñiz comenzó a trabajar en la AAA el 12 de abril de 2007 y ocupó el puesto de vicepresidente ejecutivo de Administración de la AAA desde el 2 de marzo de 2017 hasta e14 de mayo de 2018. Dicho puesto pertenece al servicio de confianza.

4. El querellado, como presidente ejecutivo de la AAA, era el supervisor inmediato del señor Arroyo Muñiz.

5. El lugar de trabajo del señor Arroyo Muñiz era en le oficina del presidente ejecutivo de la AAA, Región Sede

---

[49] *Id.* en la pág. 461.
[50] Esta nota al calce corresponde a las determinaciones de hechos del *Informe del Oficial Examinador,* las cuales fueron acogidas por la *Resolución* recurrida.

en San Juan, y su horario regular de trabajo era de 7:30 de la mañana a 4:00 de la tarde.

6. El señor Arroyo Muñiz residía en el área oeste de la isla, en el municipio de Moca.

7. Como vicepresidente ejecutivo de Administración de la AAA, el señor Arroyo Muñiz tenía, entre otras, las siguientes funciones:

a. El funcionamiento operacional y administrativo de los directorados a su cargo, tales como: Directorado de Recursos Humanos y Relaciones Laborales, Compras y Logísticas, Seguridad Corporativa y Manejo de Emergencias y Administración Central.

b. Monitorear el cumplimiento de las metas y objetivos conforme a la misión de los directorados bajo su supervisión. Dar seguimiento al cumplimiento de las métricas e indicadores establecidos y actuar e intervenir como facilitador de las acciones para asegurar el logro de los resultados y expectativas del servicio.

c. Establecer una comunicación directa con los directores de los directorados, directores ejecutivos regionales y directores auxiliares, líderes sindicales, representantes de grupos laborales y con representantes de las agencias reguladoras, funcionarios del gobierno y municipios, con contratistas y empresarios para asegurar la efectividad, calidad y cumplimiento de los compromisos, contratos y planes de trabajo, nuevas iniciativas de servicios y desarrollo de proyectos.

d. Participar, con el presidente ejecutivo, en el desarrollo de estrategias y planes de acción para que las actividades de los directorados bajo su responsabilidad se realicen conforme con los estándares de eficiencia, calidad y productividad y los servicios se presenten con la celeridad requerida.

e. Visitar las facilidades, instalaciones y plantas de la AAA para monitorear servicios, actividades y proyectos, verificar el desarrollo de nuevas estrategias, cumplimiento y el progreso de acuerdo con la planificación y programación establecida.

f. Actuar proactivamente y con sentido de urgencia para anticipar situaciones y evitar el impacto adverso a la consecución de las metas y los objetivos de trabajo de los directorados de la AAA, en la Oficina Central y regiones.

g. Participar, conjuntamente, con los directores y directores ejecutivos regionales en el desarrollo e implantación de planes de contingencia para atender situaciones de emergencia y conflictos laborales que afecten las operaciones en el servicio de la AAA.

h. Representar al presidente ejecutivo en las actividades que le fueran delegadas; participar activamente en comités especiales y equipos de trabajo para desarrollar estrategias, nuevos servicios y emitir recomendaciones.

8. Las funciones del puesto le requerían al señor Arroyo Muñiz competencia en leyes, reglamentos, normas y procedimientos de la AAA, así como estar disponible para trabajar fuera del horario regular de trabajo, incluyendo sábados, domingos y días feriados.

9. Entre el periodo del 3 de febrero de 2017 al 12 de marzo de 2018, el señor Arroyo Muñiz tuvo asignado un vehículo oficial, marca Jeep, modelo Grand Cherokee,

color negro, tablilla HYK427, con número de serie 1C4R3FAG2CC208791.

10. La Jeep Grand Cherokee formaba parte de la flota vehicular de la Región Sede en San Juan de la *AAA* y tenía el sello de Auto Expreso número PRTH02004926, registrado a la tablilla del vehículo y con la cuenta número 187733 de la AAA.

11. Para la compra de combustible del vehículo oficial, el señor Arroyo Muñiz tenía asignada una tarjeta registrada a nombre de la AAA y para su uso exclusivo.

12. El señor Arroyo Muñiz solicitó y el querellado autorizó, verbalmente, que se devolviera diariamente la Jeep Grand Cherokee en la instalación de Operaciones de Aguadilla, designada como punto de entrega, en lugar de la Región Sede en San Juan.

13. Tras la referida autorización, entre el periodo del *4* de abril de 2017 al 8 de marzo de 2018, el señor Arroyo Muñiz utilizó el vehículo oficial asignado, todos los días de la semana, antes y después de su horario regular de trabajo. Uso que excedía las 160 millas diarias y conllevó que la AAA incurriera en el desembolso de fondos públicos por concepto de peaje, combustible y mantenimiento.

14. Dentro de ese mismo periodo, el señor Arroyo Muñiz utilizó el vehículo oficial en 126 ocasiones para trasladarse desde "Aguadilla área Operacional AAA a San Juan en Sede de Regreso". En otras ocasiones, lo utilizó para transportarse entre Aguadilla y otros municipios, ida y vuelta.

15. El pago del peaje de los carriles de Auto Expreso que transitó el señor Arroyo Muñiz con el vehículo oficial, durante esas 126 ocasiones, se debitó electrónicamente de la cuenta número 187733 a nombre de la AAA y ascendió a la suma de $l,140.27.21.

16. Entre el periodo del 7 de junio de 2017 al 25 de agosto de 2017 y del 12 de diciembre de 2017 al 8 de marzo de 2018, la AAA desembolsó la suma de $2,527.33 por concepto de mantenimiento por "desgaste" del vehículo oficial. El detalle de las transacciones de mantenimiento se registró en el sistema SAP.

17. Entre el periodo del 23 de febrero de 2017 al 26 de febrero de 2018,24 la AAA desembolsó la suma de $2,244.36 por concepto de compra de combustible con la tarjeta número 4549106599970, asignada y registrada a nombre del señor Arroyo Muñiz. El detalle de las transacciones de compra de combustible se registraba en el sistema EVERTEC.

18. Cuando el señor Arroyo Muñiz utilizaba la tarjeta asignada para la compra de combustible, se registraba la localidad, cantidad, hora, millaje, tablilla del vehículo y la persona que compró el combustible. El cajero del establecimiento de combustible era el encargado de registrar dicha información en el sistema, según provista por el conductor del vehículo, incluyendo su licencia de conducir.

19. El 17 de septiembre de 2017, el Gobernador de Puerto Rico emitió la Orden Ejecutiva Núm. OE-2017-047, en la cual declaró a Puerto Rico en estado de emergencia ante el inminente paso del huracán Maria, ante el impacto que el mismo pudiera causar y para

minimizar el riesgo de un desastre, salvar vidas, proteger las propiedades, la salud y la seguridad.

20. Luego del paso de los huracanes Irma y María, el señor Arroyo Muñiz estuvo a cargo del monitoreo de todos los servicios de acarreo de agua a las áreas afectadas, así como el proceso de distribución y cotejo de tanques de agua a las áreas. afectadas por la falta de servicio en el área Oeste, debido a la ruptura de la represa Guajataca en Quebradillas. En suma, atendió la emergencia en distintas partes de la isla y sirvió como corredor ("runner") y vínculo de comunicación entre la Región Sede en San Juan y la Región Noroeste.

21. Durante la referida declaración de estado de emergencia en el país, el sistema de Auto Expreso no cobró el costo de los peajes transitados por el vehículo oficial o lo acreditó a la cuenta ("reverse toll") por instrucciones del gobierno.

22. El 7 de marzo de 2018, la Leda. Erika Berríos-Berrios, de la firma legal Schuster Aguiló, LLC, emitió un memorando legal, a petición de la AAA y dirigido a la Leda. Keralia Moreda Rodríguez, sobre el uso de vehículos oficiales en la Autoridad. Luego de evaluar las disposiciones legales y normas aplicables, dicha firma determinó lo siguiente:

De nuestro análisis concluimos que la AAA, a través de la 0A2015-03 y la carta circular de la AAA de 21 de agosto de 2015 ha establecido las salvaguardas necesarias y suficientes para asegurarse del cumplimiento con las disposiciones de LUVO[31]. De igual forma, los perfiles de las posiciones [321 analizadas justifican el que dichos funcionarios y/o funcionarias utilicen vehículos oficiales en el desempeño de sus funciones siempre y cuando dicho uso se realice conforme a las 0A2015-03 que a su vez asegura el cumplimiento con las disposiciones de la [Ley 60-20141.

23. EJ 8 de marzo de 2018, el señor Bianchi Angleró, exrepresentante y autor de la Ley 60-2014, le envió una comunicación a la OEG, la OCPR y al presidente ejecutivo de la AAA sobre el alegado uso indebido de un vehículo oficial de la AAA por parte del señor Arroyo Muñiz. Su queja estaba relacionada, principalmente, con el uso de «'luces azules" y cristales ahumados *("tintes") en supuesta violación con la Ley de Vehículos y Tránsito de Puerto Rico,* Ley Núm. 22 de 7 de enero de 2000, según enmendada.

24. Una vez la situación anterior le fue referida al querellado, éste la atendió con rapidez y contactó al señor Bianchi Angleró con el fin de notificarle que su comunicación fue referida para la investigación pertinente.

25. A petición del querellado, el Sr. Ángel Alberto Crespo Ortiz, consultor en materia de seguridad, protección y manejo de emergencias, emitió un informe intitulado *Opinión Profesional Querella (OEO) Número 21-36,* suscrito el 25 de marzo de 2022.

En resumen, de dichas determinaciones de hechos se desprende, que el señor Díaz Atienza ocupó el puesto de presidente

ejecutivo de la AAA desde el 4 de febrero de 2017 hasta el 27 de febrero de 2020. Siendo este un servidor público durante dicho periodo. Por otra parte, el señor Arroyo Muñiz ocupó el puesto de vicepresidente ejecutivo de la Administración de AAA durante el periodo de 2 de marzo de 2017 hasta el 4 de mayo de 2018. El lugar de trabajo del señor Arroyo Muñiz era la sede de San Juan y su horario regular era de 7:30am-4:00pm. A su vez, este residía en Moca.

Entre el periodo del 3 de febrero de 2017 al 12 de marzo de 2018, el señor Arroyo Muñiz tenía asignado un vehículo oficial que pertenecía a la sede de San Juan. A petición del señor Arroyo Muñiz, el señor Díaz Atienza autorizó de manera verbal que se devolviera el vehículo asignado a la sede de Aguadilla. En lo específico, autorizó al señor Arroyo Muñiz a utilizar el vehículo para beneficio personal. Siendo así, que el señor Arroyo Muñiz utilizó el vehículo "todos los días de la semana, antes y después de su horario regular de trabajo. Uso que excedía las 160 millas diarias y conllevó que la AAA incurriera en el desembolso de fondos públicos por concepto de peaje, combustible y mantenimiento".[51] A su vez, utilizó el vehículo oficial para trasladarse entre Aguadilla y San Juan, y otros pueblos alternos todos los días de la semana.

En las determinaciones de hechos se estableció, a base de las transacciones de la tarjeta oficial para gasolina y de los peajes los lugares, los días y horas en las que el señor Arroyo Muñiz utilizó el vehículo oficial. Además, los gastos que conllevó la Agencia por el uso del vehículo oficial. Entre el periodo de 7 de junio de 2017 al 25 de agosto de 2017, la AAA desembolsó la suma de $2,527.33 por concepto de mantenimiento por desgaste del vehículo oficial. A su vez, se debitó electrónicamente de la cuenta número 187733,

---

[51] Esta nota al calce corresponde a las determinaciones de hechos del *Informe del Oficial Examinador,* las cuales fueron acogidas por la *Resolución* recurrida.

asignada al señor Arroyo Muñiz, la suma de $1,140.27 por concepto de peajes. Asimismo, la AAA desembolsó una cantidad de $2,244.36 por concepto de compra de combustible con la tarjeta asignada al señor Arroyo Muñiz.

De manera que, la evidencia que obra en el expediente es suficiente para colegir, que se configuró el **primer elemento** del Art. 4.2 (b) de la LOOEG.[52] No existe controversia en que el señor Díaz Atienza era el Presidente Ejecutivo de la AAA, clasificado como servidor público, según lo define el Art. 1.2(g) de la LOOEG.[53] También se estableció mediante prueba clara, robusta y convincente, que el señor Díaz Atienza actuó en el marco de los deberes y facultades de su cargo de Presidente Ejecutivo, cumpliéndose el **segundo elemento** de la violación ética.

Sobre el **tercer elemento**, la prueba demostró que, fue el señor Díaz Atienza quien autorizó al señor Arroyo Muñiz, persona tanto privada como servidor público, la entrega del vehículo oficial en Aguadilla, sede diferente a su lugar de empleo. Además, lo hizo sin velar por lo que establece la Ley Núm. 60-2014 y la Ley Núm. 1-2012.

El Oficial Examinador halló probado, que, el señor Díaz Atienza, en contravención de la Ley Núm. 60-2014, autorizó el uso indebido de un vehículo oficial. Documentos en el expediente administrativo evidencian dichas actuaciones. Entre estos figuran, un documento firmado por el señor Díaz Atienza, certificando que el punto de entrega o ubicación establecida para que el señor Arroyo Muñiz devolviera el vehículo oficial asignado era la instalación de Operaciones de Aguadilla. Además, en dicho documento el señor Díaz Atienza certificó que había autorizado lo anterior de forma verbal al señor Arroyo Muñiz.

---

[52] 3 LPRA § 1857a.
[53] *Id.* § 1854.

Otro documento incluido, el Sr. Joe A. Colón Rodríguez, director auxiliar de Flota de la AAA, certificó el 21 de mayo de 2021, el desembolso por parte de la AAA de los gastos incurridos en los viajes del señor Arroyo Muñiz por concepto de peaje, combustible y mantenimiento del vehículo oficial.

Otro documento que consta en el expediente es una certificación suscrita por el señor José Rivera Ferrer, Oficial de Servicios de la flota sede y por el Sr. Héctor Morales Cotto, Director Auxiliar de la flota, del 19 de marzo de 2018, sobre el vehículo oficial asignado al señor Arroyo Muñiz. También, se incluyó como evidencia, una declaración jurada suscrita el 4 de marzo de 2020 por la señora Arce Alers certificando que el vehículo asignado al señor Arroyo Muñiz no pertenecía a la Flota Región Oeste de la AAA. Además, una comunicación del 10 de mayo de 2021, del centro de Servicio al Cliente de Auto Expreso, Sistema de Peaje electrónico en la que se provee un historial de los peajes transitados por el vehículo asignado al señor Arroyo Muñiz, desde el 4 de abril de 2017 hasta el 13 de marzo de 2018.

Finalmente, igual se configuró el **cuarto elemento** constitutivo de la conducta prohibida, esto es el uso de un vehículo oficial una vez concluida la jornada laboral, según establece el Art. 3 de la Ley Núm. 60-2014.[54] Al beneficiar a un tercero -señor Arroyo Muñiz-, con el uso del vehículo oficial para que se transportara desde un lugar cercano a su residencia hasta su sede de trabajo diariamente sin costear los gastos de transportación, constituyó un beneficio no permitido por ley. Es decir, la Ley no permite el uso del vehículo oficial para horarios fuera de la jornada laboral. Tampoco permite que la entrega del vehículo oficial se lleve a cabo en lugar diferente a la sede de trabajo del funcionario, salvo trate de un

---

[54] 3 LPRA § 9092.

empleado que conforme parte de las excepciones que expone referida Ley en el Art. 5.[55] Asimismo, no permite que un vehículo oficial sea utilizado para asuntos personales. La transportación de un funcionario público a su trabajo conforma parte de sus asuntos personales. En conclusión, en el expediente administrativo existe prueba clara, robusta y convincente de todos los elementos del inciso (b) del Art. 4.2 de la LOOEG.[56]

C.

Por otro lado, según adelantamos al discutir el segundo señalamiento de error, la Orden Administrativa OA-2015-03, a modo de excepción, permite a los "funcionarios y empleados de la Autoridad que tienen la obligación de atender de forma directa y personal cualquier emergencia o situación que requiera atención inmediata relacionada con la operación y mantenimiento de los sistemas e instalaciones de agua y alcantarillados de la Autoridad",[57] entregar el vehículo asignado en el lugar que autorice el Presidente Ejecutivo o su representante autorizado. Esto, una vez concluida su jornada laboral.

Aun cuando aceptáramos, según arguye el señor Díaz Atienza, que la Orden Administrativa OA-2015-03 le facultó para otorgar el permiso al señor Arroyo Muñiz, lo cierto es que el señor Arroyo Muñiz no tenía las funciones de emergencia a las que hace referencia la excepción. Por tanto, este no teniendo las funciones de atención inmediata tales descritas en referida Orden, el presidente, señor Díaz Atienza, no estaba facultado de otorgar un permiso para que el señor Arroyo Muñiz entregara el vehículo en una sede diferente a la de su lugar de trabajo.

---

[55] *Id.* § 9094.
[56] 3 LPRA § 1857a.
[57] Orden Administrativa, OA-2015-03, *Para regular el uso de vehículos oficiales de la Autoridad,* el 25 de julio de 2015, en la pág. 3.

El señor Arroyo Muñiz no tenía la obligación de atender de forma directa e inmediata cualquier emergencia o situación relacionada a la operación y mantenimiento de los sistemas e instalaciones de agua y alcantarillados de la AAA. Por lo tanto, no podía autorizársele entregar el vehículo oficial en Aguadilla. Asimismo, como hemos expresado anteriormente, dicha autorización conllevó a un beneficio a favor del señor Arroyo Muñiz.

Por lo anteriormente expuesto, no se cometió el cuarto error señalado.

## VI.

En su quinto señalamiento, el señor Díaz Atienza aduce que erró la OEG al imponer una multa de $2,000.00, sin aplicar el principio de razonabilidad y proporcionalidad. Examinemos la validez de este reclamo.

## A.

La Sección 7.1 de *la Ley de Procedimiento Administrativo Uniforme* (LPAU), establece que, "[t]oda violación a las leyes que administran las agencias o a los reglamentos emitidos al amparo de las mismas podrá ser penalizada con multas administrativas que no excederán de cinco mil (5,000) dólares por cada violación".[58] Por otro lado, referida sección permite la imposición de multas mayores a $5,000.00 en casos donde leyes especiales así lo dispongan. En lo especifico, establece que:

> En caso de que la ley especial de que se trate sólo provea penalidades criminales, el jefe de la agencia, a su opción, podrá radicar una querella administrativa al amparo de esta Sección para procesar el caso por la vía administrativa. Si la ley especial de que se trate dispone una penalidad administrativa mayor a la que se establece en esta Sección, la agencia podrá imponer la penalidad mayor.[59]

---

[58] *Id.*
[59] *Id.*

En el caso ante nos, una Ley especial regula la cantidad de multas administrativas. El Art. 4.7 de la LOOEP dispone lo siguiente:

> Toda persona que viole las prohibiciones y disposiciones establecidas en este Capítulo y en los reglamentos, en las órdenes o en las normas promulgadas a su amparo puede ser castigada por la Dirección Ejecutiva con multa administrativa, que no excederá de veinte mil (20,000) dólares por cada violación. Lo anterior no limita la facultad de la Dirección Ejecutiva de imponer, además de la multa administrativa, la sanción de triple daño.[60]

En cuanto a la evaluación de la razonabilidad de una multa administrativa impuesta, nuestro más alto foro ha expresado que, "la revisión judicial de las determinaciones administrativas no es ilimitada, ya que merecen consideración y respeto".[61] Asimismo, ha destacado que, "[e]ntre las actuaciones administrativas sujetas a una revisión judicial limitada se encuentran los procedimientos mediante los cuales una agencia impone penalidades por violaciones a la ley o al reglamento cuya implantación se le ha delegado".[62]

El Tribunal Supremo ha reconocido que "las agencias gozan de una amplia discreción en lo referente a la imposición de sanciones, pues diariamente implantan la ley orgánica y los reglamentos, y son las que, por su conocimiento especializado, están en mejor posición de establecer cuál es el efecto de la violación en el sector reglamentado".[63] Por tanto, "las determinaciones de hecho de una agencia se sostendrán si se apoyan en evidencia sustancial que obre en el expediente administrativo".[64] En lo referente a la facultad de revisión:

> Siempre que la sanción **administrativa** esté fundamentada en evidencia sustancial, *no constituya una actuación "ultra vires"* y tenga una relación **razonable** con los actos que se quieren prohibir, los tribunales le brindarán gran deferencia. La

---

[60] 3 LPRA § 1857f.
[61] *Comisionado de Seguros de Puerto Rico* v. *Prime Life Parners*, 162 DPR 334, 340 (2004).
[62] *Id.*
[63] *Id.* en la pág. 341.
[64] *Id.* en la pág. 340.

revisión judicial de este tipo de actuación **administrativa**, de ordinario, no depende de si el tribunal considera que la sanción es muy fuerte o no, ya que en la implantación de la ley y en la consecución de los objetivos legislativos es la agencia, y no el tribunal, la que debe determinar cuál es la sanción que aplica a cada situación fáctica.[65]

B.

A la luz de estas disposiciones legales, no tiene razón el señor Díaz Atienza al alegar que la naturaleza del uso del vehículo oficial no justificó la sanción de tal magnitud.

Las disposiciones que regulan la cantidad máxima para la imposición de multas administrativas en el presente caso están contenidas en el Art. 4.7 de la LOOEG. Además, la sanción se encuentra debidamente fundamentada en evidencia sustancial, no constituye una actuación "ultra vires" y tiene una relación razonable con los actos que se quieren prohibir. Con prueba clara, robusta y convincente se demostró que, este, como Presidente Ejecutivo de la AAA, autorizó a un tercero a utilizar un vehículo oficial para asuntos personales y que estas acciones en contravención a sus obligaciones como Presidente Ejecutivo no permitidas en ley, conllevaron a la pérdida de fondos públicos. El señor Díaz Atienza no ha logrado rebatir la presunción de corrección que cobija dicha determinación administrativa, por lo que procede confirmar el dictamen recurrido.

VII.

Por los fundamentos antes expuestos, se *confirma* el dictamen recurrido.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[65] *Id.* en la págs. 341-342 (énfasis original).